418 So.2d 1020 (1982)
Albert W. AULD, M.D., Appellant,
v.
Eugene HOLLY, M.D., et al., Appellees.
Nos. 78-2657, 79-972.
District Court of Appeal of Florida, Fourth District.
June 16, 1982.
Rehearings Denied September 20, 1982.
*1021 Edna L. Caruso, West Palm Beach, and Stephen Cahen, Miami, for appellant.
Marjorie Gadarian Graham of Jones & Foster, P.A., West Palm Beach, for appellee-Eugene Holly, M.D.
Michael B. Davis of Walton, Lantaff, Schroeder, Carson & Wahl, West Palm Beach, for appellee-Hubert L. Rosomoff, M.D.
Rosemary Cooney and John S. Wilbur, Jr., of Paxton, Crow, Taplin & Bragg, P.A., West Palm Beach, for appellee-Robert S. Tolmach, M.D.
Kent S. Pratt of Law Office of Frank G. Cibula, Jr., West Palm Beach, for appellee-Albert Ehlert, M.D.
PER CURIAM.
This is an appeal from a judgment rendered in favor of the defendants (the appellees) in a defamation action. The principal issues are (1) whether the trial court erred in limiting discovery based on Section 768.40, Florida Statutes (1977), and (2) whether the trial court improperly instructed the jury on the elements necessary to prove slander. We reverse and remand for a new trial.[1]
The plaintiff below, Dr. Auld (the appellant), applied for staff privileges at Good Samaritan Hospital. The hospital's by-laws required him to release from liability hospital representatives and persons furnishing information concerning his application to the hospital. The release covered acts connected with his application and performed in good faith and without malice.
The hospital rules also required Auld to interview with the chief physician in charge of the division in which he desired staff privileges, the neurosurgery division. Dr. Holly, who was the chief physician of neurosurgery and is an appellee here, interviewed Auld. Holly also contacted a number of physicians to verify information gleaned from the interview. Those physicians included the other appellees, Drs. Rosomoff, Tolmach, and Ehlert.
Dr. Holly submitted a report concerning Auld to the hospital's credentials committee.[2] The committee, for whatever reason, denied Auld's application. The committee's decision was later affirmed by the hospital's appellate review committee.
*1022 Dr. Auld then filed suit against the four appellees. He alleged that he was denied staff privileges at the hospital; suffered a loss of reputation, referrals, patients, and fees; sustained a blemish on his record; and suffered mental pain as a result of allegedly false and defamatory statements made by Drs. Rosomoff, Tolmack, and Ehlert and published to the committee by Dr. Holly. The appellees denied the allegations of the complaint and alleged that the statements were true and privileged.
Dr. Auld sought discovery of the credentials committee's records and sought to examine witnesses concerning the denial of staff privileges. He alleged that discovery was necessary to refute the appellees' assertion that he was denied staff privileges because of an incident involving the filming of a pornographic movie on his yacht, rather than appellees' alleged defamatory statements. The trial court denied discovery on the grounds that it was barred by Section 768.40(4), Florida Statutes (1977).
The defamation action was tried before a jury. The jury returned a special verdict finding that the allegedly defamatory statements were made, but that the statements did not "tend to expose the Plaintiff to hatred, ridicule or contempt or tend to injure the Plaintiff in his profession." Thus, the jury found that the statements were not defamatory because they did not cause Auld any damages. The jury did not make any findings on whether the statements were true or privileged. A judgment was entered in accordance with the verdict.

DISCOVERY PRIVILEGE
The first question we must decide is whether the trial court erred in limiting discovery. Dr. Auld asserts that the trial court erred by refusing to allow discovery of the credentials committee's records and by refusing to allow Auld to examine witnesses concerning the committee's denial of Auld's application for staff privileges. Auld contends that he needed the records to prove that the allegedly defamatory statements caused the denial.
The appellees assert that those proceedings were protected by Section 768.40, Florida Statutes, and that subsection (4) of the statute bars discovery of those proceedings.[3] *1023 While we find some merit in the appellees' position, we have concluded that the statute does not bar discovery in this case.
We begin our analysis by noting that almost all of the provisions of Section 768.40, Florida Statutes (1981), are ambiguous. The Legislature has amended this statute four times since its enactment, and with each amendment the statute has become more complicated and the exact intent of the Legislature more difficult to discern. See Ch. 72-62, §§ 1 and 2; Ch. 73-50, §§ 1 and 2; Ch. 77-461, §§ 1 and 2; Ch. 79-400, § 285; and Ch. 80-353, § 3, Laws of Fla.
What is obvious from the statute, however, is that the Legislature has endorsed peer review as an important means to foster the improvement of health care services in Florida. By enacting this statute, the Legislature has encouraged self-policing and peer review by so-called "medical review committees."
A "medical review committee" was originally defined as any committee "which is formed to evaluate and improve the quality of health care rendered by providers of health service, to determine that health services were professionally indicated or that the cost of health care was considered reasonable... ." Ch. 72-62, § 1, Laws of Fla. The definition was later expanded to include committees which determine whether health services "were performed in compliance with the applicable standard of care." Ch. 73-50, § 1, Laws of Fla.
At the outset, we must decide whether a hospital's credentials committee is a "medical review committee" as defined by the statute. A credentials committee is a medical review committee so long as the purpose of the committee is one of those listed in the statute. It is apparent that at least one of the purposes of the credentials committee in the present case is to improve the quality of health care at the hospital by limiting staff privileges to doctors of a certain caliber of competence. Therefore, we conclude that the credentials committee is a medical review committee.[4]
The Legislature apparently enacted Section 768.40 in response to the problems confronting self-policing and peer review efforts by medical review committees. We perceive at least two major problems that the Legislature apparently addressed: (1) people will refuse to participate because of the threat of a lawsuit against them by the people they police, and (2) people will refuse to furnish information to the committees in order to protect their friends and colleagues from malpractice liability.
The Legislature addressed the first of these problems by enacting subsection (2) of Section 768.40. As originally enacted, subsection (2) conferred a limited tort immunity *1024 on the members of medical review committees. In 1980 the Legislature expanded the tort immunity to protect "health care providers" that furnish information to the committees. Ch. 80-353, § 3, Laws of Fla. The statute defines health care providers as physicians, osteopaths, podiatrists, dentists, chiropractors, and pharmacists. § 768.40(1), Fla. Stat. (1981); see Ch. 77-461, § 1, Laws of Fla. Thus, medical review committees and the doctors who provide information to the committees enjoy statutory tort immunity under Section 768.40(2).
This immunity protects persons who make mistakes in reviewing and evaluating their peers or in furnishing information to a review committee. Without this immunity, committee members might not want to participate because of the threat of a lawsuit against them by the doctors whose activities are reviewed. Similarly, without tort immunity, other doctors might refuse to furnish information to a committee for fear of defamation suits against them.[5] This tort immunity, however, is limited; it applies only so long as the protected party acts without fraud or malice. Thus, while the Legislature recognized that the threat of lawsuits might inhibit the activities of medical review committees, it was not willing to absolutely bar suits against committee members and the doctors who furnish information to the committees. The Legislature merely said that so long as those engaged in the self-policing effort act without fraud or malice, they will incur no tort liability for their mistakes.
After having enacted subsection (2) to deal with the problem of lawsuits by a doctor whose conduct was reviewed, the Legislature added subsection (4) to the statute.[6] We believe that this subsection was intended to address a different problem than subsection (2), the problem that the records of review proceedings might be used by a doctor's patient to prove malpractice. Subsection (4) provides as follows:
The proceedings and record of ... [a medical review committee] shall not be subject to discovery ... in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by [a medical review committee]... .
§ 768.40(4), Fla. Stat. (1981).
Because of subsection (4), a doctor can provide information to a committee without the fear that the information might later be used against a colleague in a malpractice action. Even if the information already existed, the activity of the committee in marshalling the facts and making a determination could be very prejudicial in a subsequent malpractice case. Thus, we believe that the Legislature added subsection (4) because it believed that the medical community would not enthusiastically engage in self-policing as a means to improve health care if the self-policing efforts could later be used in medical malpractice cases.
We have previously expressed this same view of the Legislature's intent in enacting subsection (4):
[T]he legislature could have felt that a medical society committee examining the alleged negligence of a physician, may be inhibited in its proceedings if the participants were aware that anything disclosed at the meeting could be used to prove a case against the physician in a civil action for malpractice. Hence, the legislature, in Section 768.40(4), prohibited discovery of the proceedings and records of the committee. Our decision does no harm to *1025 that legislative determination. We would also note that this bar to discovery does not, by operation, effectively bar a cause of action for malpractice since evidence of malpractice is otherwise obtainable.
Good Samaritan Hospital Ass'n, Inc. v. Simon, 370 So.2d 1174, 1176 (Fla. 4th DCA 1979). One of our sister courts, the Third District, has also read subsection (4) as preventing the use of medical review records in malpractice cases: "[T]he statute immunizes the records from discovery in a malpractice case...." Dade County Medical Ass'n v. Hlis, 372 So.2d 117, 119 n. 2 (Fla.3d DCA 1979).
Consistent with those views, today we hold that the discovery privilege of subsection (4) applies only in civil actions in which a doctor, or other health care provider as defined by the statute, is sued for malpractice or a similar deviation from the acceptable medical standards in the delivery of professional health services. In doing so, we rely on both the intent of the Legislature and the language of the statute.
Turning to the language of subsection (4), we find three requirements for the application of the discovery privilege. First, the privilege applies only in civil actions. Second, it applies only in actions against providers of health services, i.e., physicians, osteopaths, dentists, chiropractors, and pharmacists. Finally, the privilege applies only in actions "arising out of the matters which are the subject of evaluation and review" by a medical review committee.
The first two requirements seem rather clear cut. But the last requirement, which is the key to interpreting the extent of the privilege, is ambiguous. In interpreting this provision, we must bear in mind the strong public policy favoring discovery and the ascertainment of truth in legal proceedings. See Jones v. Seaboard Coast Line Railroad, 297 So.2d 861, 863 (Fla.2d DCA 1974) (rules are liberally construed in favor of discovery); 19 Fla. Jur.2d Discovery and Depositions, § 1 (1980) (rules are liberally construed in favor of discovery); 23 Am.Jur.2d Depositions and Discovery § 144 (1965) (statutes and rules are liberally construed in favor of discovery). This policy requires us to narrowly construe statutes, such as the present statute, which prevent parties from discovering why their legitimate interests have been adversely affected. If a statute is susceptible to different but equally tenable constructions, we must adopt the construction which allows discovery. We cannot, without a clear expression of legislative intent, allow a cloak of secrecy to envelop a proceeding that substantially affects a person's legitimate interests.
We think that subsection (4) is fairly susceptible to different constructions. For example, Dr. Holly is a provider of health services and he is being sued for furnishing information to the committee. Arguably, he is being sued for a matter that was the subject of evaluation and review by the committee and, arguably, the discovery privilege applies. But we cannot accept such a broad reading of subsection (4) in the face of an obligation to narrowly construe such statutes. We believe that the Legislature intended the discovery privilege to apply in suits in which a health care provider is being sued for malpractice. We interpret the phrase "matters which are the subject of evaluation and review" to mean the provision of health care services; it is the provision of such services that are the subject of review.
We think our interpretation is supported by the different language used in subsections (2) and (4). When subsection (4) was added, the tort immunity of subsection (2) protected committee members. Only later was the tort immunity extended to health care providers that furnish information to the committees. See Ch. 80-353, § 3, Laws of Fla. Yet, when the Legislature adopted subsection (4) it said that the discovery privilege would apply in suits against "health care providers"; it did not say in suits against "committee members." We think this choice of words shows that the discovery privilege was intended to apply only when a doctor who has been the subject of evaluation and review is later sued *1026 concerning the same matters which were evaluated and reviewed by the committee.[7]
We also note that the discovery privilege applies only in suits against health care providers, which are defined as physicians, osteopaths, podiatrists, dentists, chiropractors, and pharmacists. We point out the inconsistency that would result if we were to hold that the discovery privilege applied in a defamation suit against a doctor even though the privilege would not apply in a suit against a hospital administrator who was a member of a review committee. We do not think the Legislature intended to enact a statute that would apply in suits against some committee members but not others.[8]
Our interpretation, that subsection (4) does not apply in defamation suits brought by a doctor who was the subject of review, resolves the dilemma we faced in Good Samaritan Hospital Ass'n v. Simon, supra ("Simon"). In that case we noted the apparent conflict between the provisions of subsections (2) and (4). We resolved the conflict in Simon by resorting to the rule of statutory construction that the courts will not attribute absurd results to the Legislature. We concluded that the Legislature would not have authorized a cause of action against a committee member for fraud and malice and yet barred discovery of the evidence necessary to maintain the action. Today's construction of Section 768.40(4) permits the result we reached in Simon without the judicial straining we went through in Simon.
In addition to deciding that the statute is inapplicable, we hold that public policy does not suggest that discovery should be denied in this case. The Third District recently said that, "[t]he non-applicability of the statutory privilege does not mean... that we may or should ignore the considerations of public policy which informed the enactment of the statute... ." Dade County Medical Ass'n v. Hlis, supra, 372 So.2d at 119. The court adopted a rule that the confidential proceedings of a medical review committee cannot be discovered without a showing of extraordinary circumstances or need. The court adopted this rule in order to safeguard the legislative policy of precluding civil litigants from discovering the proceedings of a medical review committee in order to prove medical negligence. This policy consideration, however, is not implicated when the party seeking discovery of a peer review proceeding is the doctor who was the subject of review. Accordingly, neither the statute nor its underlying policy prevent discovery in this case.[9]
*1027 The appellees contend that any error in limiting discovery was harmless because the evidence sought, the reason the committee rejected Auld's application, would bear only on the question of damages. We reject this contention. The jury was asked to decide, in determining whether the statements were defamatory, whether the statements tended to expose Auld to hatred, ridicule, or contempt or tended to injure him in his profession. In other words, the jury was asked to decide whether Auld suffered any damages that would make the statements defamatory. We cannot say with any degree of certainty that the jury would not have decided this case differently if it had been allowed to know the effect the statements had on the committee's decision to deny Auld's application.
Because of the obvious difficulty we have had in construing the provisions of Section 768.40(4) and our belief that the construction of the statute is an issue of great public importance, we certify the issue for resolution by the Supreme Court pursuant to Florida Rule of Appellate Procedure 9.030(a)(2)(A)(v):
IS THE DISCOVERY PRIVILEGE SET OUT IN SECTION 768.40(4), FLORIDA STATUTES, LIMITED TO CIVIL ACTIONS AGAINST PROVIDERS OF HEALTH SERVICES BASED ON MEDICAL MALPRACTICE?

JURY INSTRUCTIONS ON DEFAMATION
The second issue is whether the trial court erred in allowing the jury to decide if certain statements alleged to be slander per se were defamatory. We hold that the question of whether a statement constitutes slander per se is normally a question of law and must be decided, when possible, by the court rather than the jury. As we view this record, the trial court erred in allowing the jury to decide the actionable nature of some of the statements in question.
Where a publication is false and not privileged, and causes injury to a person in his business or trade, it is presumed to injure him and is actionable per se. Thus, the Florida Supreme Court has held:
Where a publication is false and not privileged, and is such that its natural and proximate consequence necessarily causes injury to a person in his personal, social, official or business relations of life, wrong and injury are presumed or implied, and such publication is actionable per se.
Joopanenko v. Gavagan, 67 So.2d 434 (Fla. 1953). Words are actionable per se when:
their injurious character is a fact of common notoriety, established by the general consent of men, and the court consequently takes judicial notice of it. They necessarily import damage; therefore, in such cases general damages need not be pleaded or proved, but are conclusively presumed to result. Special damages need not be shown in order to sustain the action.
19 Fla. Jur.2d Defamation and Privacy, § 5 (1980).
Keeping in mind that the statements refer to a practicing physician, the following sampling of the statements should suffice to demonstrate their injurious character:
1. Dr. Auld left town suddenly and under suspicious circumstances.
2. Something had happened and Dr. Auld left town rather precipitiously.

*1028 3. Dr. Auld had been run out of town or it seemed he was run out of town.
4. Dr. Auld had left in a hurry to go into the Navy.
5. Dr. Auld's malpractice defense attorney was looking for him.
6. Dr. Auld abandoned patients in the hospital.
7. This guy is bad news.
8. Dr. Auld's Miami practice was tied in with a notorious neurologist, who referred him most of his patients and they had a falling out so Auld's practice went to pot.
9. Dr. Auld was kicked out of a small hospital.
10. Dr. Auld left town because of many malpractice suits against him.
11. Dr. Auld did a lot of ghost surgery for the notorious neurologist.
12. Dr. Auld was likely to develop rapport with fringe operators and do ghost surgery for them also. There was no reason to suspect that this might not occur again.
13. Dr. Auld did not give adequate post-operative care.
14. Dr. Auld performed unnecessary surgery.
15. There was an altercation of some sort with Dr. Auld's colleagues.
16. Dr. Auld had a boat where pornographic movies were made.
17. Dr. Auld had apparently applied all over the east coast for jobs.
In instructing the jury, the trial court gave a combination of Standard Jury Instruction MI 4.1 and 4.2. However, a footnote at the end of Instruction 4.1 admonishes the trial courts not to give MI 4.1(b) if the alleged defamatory matter is defamatory per se. MI 4.1(b) is the portion of the instruction which allows the jury to determine whether the words in question are defamatory by allowing the jury to decide whether the words tend to expose the claimant to hatred, ridicule, or contempt or tend to injure the claimant in his business or occupation. Of course, the reason 4.1(b) should not be given if the words are defamatory per se is that it is a question for the court, not the jury.
While not all of the foregoing statements are actionable per se, we hold that the statements listed as 6, 9, 10, 13, and 14 fall into that category as a matter of law. It seems clear to us that publication of untrue statements about a physician to the effect that he does unnecessary surgery, that he abandons his patients in the hospital, that he does poor post-operative care, that he was kicked out of a hospital, or that he ran out of town because of too many malpractice cases constitutes injury to the physician in his profession. Therefore, it was the trial court's function to determine those statements were slander per se and allowing the jury to make the determination was error. Some of the other statements listed could well be found by the jury to be slanderous per quod and, thus, allowing the jury to make that determination under proper instructions was appropriate.
To summarize, we hold (1) that the discovery privilege of Section 768.40(4), Florida Statutes (1981), applies only in civil actions in which a health care provider, as defined by the statute, is sued for malpractice or a similar deviation from acceptable medical standards in the delivery of health services, and (2) that the trial court erred by allowing the jury to decide the actionable nature of certain allegedly defamatory statements. Accordingly, we reverse the judgment, remand for a new trial on all issues, and certify the discovery issue as one of great public importance.
REVERSED AND REMANDED; QUESTION CERTIFIED.
DOWNEY, ANSTEAD and HURLEY, JJ., concur.
NOTES
[1] We note that the appellant also asserts that the trial court erred in taxing the cost of copies of depositions. We have previously held that such copies are taxable in the discretion of the trial court if it finds that the copies, like the original, served a useful purpose. Moore v. Caughey, 368 So.2d 109 (Fla. 4th DCA 1979). Since, however, we are reversing the judgment on other grounds, and the cost order is likewise reversed, we need not reach the costs issue in this case.
[2] The report provided as follows:
 Credentials Committee
 Good Samaritan Hospital
 P.O. Box 3166
 West Palm Beach, Florida 33402
 Re: Albert W. Auld, M.D.
Gentlemen:

I have interviewed Dr. Auld in our office and have reviewed his curriculum vitae as well as his bibliography.
I was impressed by the fact that Dr. Auld was unable to really give me a good reason why he left Miami and why he had a subsequent short career in the Navy. Following this I have spoken with several individuals, neurosurgeons and a general surgeon in Miami and requested some information about him. Some of our neurosurgical colleagues in Miami were less than impressed with Dr. Auld's performance. He apparently has lacked giving postoperative care and his previous partners did not seem to bee [sic] too unhappy that he has left them. He apparently has done some unnecessary surgical procedures and his leaving Miami was prompted by a falling out with a neurologist who was his main referral source. Because not all reports were detrimental about him I cannot frankly oppose his admission to the Good Samaritan Hospital Staff but I certainly would recommend that the Credentials Committee take a long, hard look at his career and at his credentials.
If I can be of any further assistance, please do not hesitate to call me.
 Very truly yours,
 /s/ E. Holly
 Eugene H. Holly, M.D.

[3] The current version of the statute, which we cite because subsection (4) has remained unchanged throughout this action, provides as follows:

768.40 Medical review committee, immunity from liability. 
(1) As used in this section, the term "medical review committee" or "committee" means a committee of a state or local professional society of health care providers or of a medical staff of a licensed hospital or nursing home, provided the medical staff operates pursuant to written bylaws that have been approved by the governing board of the hospital or nursing home, which committee is formed to evaluate and improve the quality of health care rendered by providers of health service or to determine that health services rendered were professionally indicated or were performed in compliance with the applicable standard of care or that the cost of health care rendered was considered reasonable by the providers of professional health services in the area. The term "health care providers" means physicians licensed under chapter 458, osteopaths licensed under chapter 459, podiatrists licensed under chapter 461, dentists licensed under chapter 466, chiropractors licensed under chapter 460, or pharmacists licensed under chapter 465.
(2) There shall be no monetary liability on the part of, and no cause of action for damages shall arise against any member of a duly appointed medical review committee, or any health care provider furnishing any information, including information concerning the prescribing of substances listed in s. 893.03(2), to such committee, for any act or proceeding undertaken or performed within the scope of the functions of any such committee if the committee member or health care provider acts without malice or fraud. The immunity provided to members of a duly appointed medical review committee shall apply only to actions by providers of health services, and in no way shall this section render any medical review committee immune from any action in tort or contract brought by a patient or his successors or assigns. The provisions of this section do not affect the official immunity of an officer or employee of a public corporation.
(3) Except as provided in subsection (2), this section shall not be construed to confer immunity from liability on any professional society or hospital or upon any health professional while performing services other than as a member of a medical review committee. In any case in which, but for the enactment of the preceding provisions of this section, a cause of action would arise against a hospital, professional society, or an individual health professional, such cause of action shall exist as if the preceding provisions had not been enacted.
(4) The proceedings and records of committees as described in the preceding subsections shall not be subject to discovery or introduction into evidence in any civil action against a provider of professional health services arising out of the matters which are the subject of evaluation and review by such committee, and no person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such civil action as to any evidence or other matters produced or presented during the proceedings of such committee or as to any findings, recommendations, evaluations, opinions, or other actions of such committee or any members thereof. However, information, documents, or records otherwise available from original sources are not to be construed as immune from discovery or use in any such civil action merely because they were presented during proceedings of such committee, nor should any person who testifies before such committee or who is a member of such committee be prevented from testifying as to matters within his knowledge, but the said witness cannot be asked about his testimony before such a committee or opinions formed by him as a result of said committee hearings.
§ 768.40, Fla. Stat. (1981).
[4] See Mennes v. South Chicago Community Hospital, 100 Ill. App.3d 1029, 56 Ill.Dec. 547, 427 N.E.2d 952 (1st DCA 1981); Matchett v. Superior Court, 40 Cal. App.3d 623, 115 Cal. Rptr. 317 (3d DCA 1974); Annot., Discovery of Hospital's Internal Records of Communications as to Qualifications or Evaluations of Individual Physician, 81 A.L.R.3d 944 (1977).
[5] We, of course, make no ruling in this case on whether these doctors would be protected from tort liability by the statutory tort immunity, if it had been in effect, or by a common-law privilege, as such are not issues in this appeal. See generally Prosser, Law of Torts § 115 (4th ed. 1971). Rather, we merely intend to point out the apparent purpose of the statutory tort immunity.
[6] Subsection (4) was added at the same time that the definition of medical review committees was amended to include committees that determine whether health care services were provided in compliance with applicable standards, i.e., whether a doctor was guilty of malpractice. See Ch. 73-50, §§ 1 and 2, Laws of Fla.
[7] Further evidence can be found in subsection (3). That subsection provides in part:

In any case in which, but for the enactment of the preceding provisions of this section, a cause of action would arise against a hospital, professional society, or an individual health professional, such cause of action shall exist as if the preceding provisions had not been enacted.
§ 768.40(3), Fla. Stat. (1981). Under one reading of subsection (3), it abolishes the tort immunity of subsection (2) because the people protected by subsection (2) are almost always health professionals. That, of course, would be an absurd result because subsections (2) and (3) were enacted together. See Ch. 72-62, § 2, Laws of Fla. To read these subsections consistently we must infer that the phrase, "cause of action [arising] against ... an individual health professional," was meant to define malpractice suits and not suits against committee members for their actions as committee members. In other words, we believe the Legislature intended a distinction between suits against doctors as doctors and suits against doctors in their role as committee members. If so, then a reading of the similar language in subsection (4) "action against a provider of professional health services," forces us to conclude that subsection (4) was not intended to prevent a doctor who was the subject of peer review from discovering the committee proceedings.
[8] As written the discovery privilege also does not apply to actions against other persons, such as patients or nurses, who might supply information to a committee. Presumably, even under appellees' view, the committee proceedings would be subject to discovery in an action against a patient for defamation.
[9] We note that the hospital's own by-laws, although not relied on by the appellant, would also allow the appellant to discover the information sought in this case. The "By-laws and Rules and Regulations for the Government of the Medical Staff of the Good Samaritan Hospital," which were admitted into evidence in the case at bar, indicate that the plaintiff has an absolute right to the information which was denied by the trial court. Article V of the by-laws contains an elaborate and carefully crafted procedure for appointment and reappointment to the hospital's staff. Section 2(f) of that article indicates that a physician who receives an adverse recommendation is entitled to certain due process rights including a hearing and appellate review procedure pursuant to Article VIII. In turn, Article VIII, Section 6(e) indicates that:

The affected practitioner shall have access to the report and record (and transcription, if any) of the ad hoc hearing committee and all other material, favorable or unfavorable, that was considered in making the adverse recommendation or decision against him.
Thus, the hospital's own rules guarantee access to the information sought by appellant in the trial court.