551 So.2d 538 (1989)
LAKE HOSPITAL AND CLINIC, INC., Psychiatric Institutes of America, Inc., National Medical Enterprises, Inc., Jesse J. Kaye and Alan T. Penn, Appellants/Cross Appellees,
v.
Norman SILVERSMITH, M.D., Appellee/Cross Appellant.
Nos. 4-86-1851, 4-86-1870, 4-86-1898, 4-86-2345 and 4-86-2692.
District Court of Appeal of Florida, Fourth District.
September 27, 1989.
Rehearing Denied November 17, 1989.
Motions for Clarification, Rehearing, Rehearing and Certification Denied December 1, 1989.
*539 Larry Klein of Klein, Beranek, & Walsh, Earl Denny of Searcy, Denney, Scarola, Barnhart & Shipley, and Nancy P. Maxwell of Metzger, Sonneborn & Rutter, P.A., West Palm Beach, for appellants/cross appellees.
Philip Burlington and Edna L. Caruso of Edna L. Caruso, P.A., and Richard D. Schuler, of Schuler and Wilkerson, P.A., West Palm Beach, for appellee/cross appellant.
Motions for Clarification, Rehearing, Rehearing en Banc and Certification Denied December 1, 1989.
ANSTEAD, Judge.
This is an appeal from a final judgment awarding appellee, Dr. Norman Silversmith, compensatory and punitive damages arising out of the termination of his medical staff privileges at Lake Hospital and Clinic, Inc., a private psychiatric hospital. We reverse.
Silversmith filed an action against National Medical Enterprises, Inc. (NME), Psychiatric Institutes of America (PIA), Lake Hospital, Jesse J. Kaye, M.D., a medical staff member at Lake Hospital, and Alan T. Penn, a director at Lake Hospital. PIA is a subsidiary of NME, and Lake Hospital is a subsidiary of PIA. Upon trial, a jury returned a verdict finding Lake Hospital, PIA, and NME guilty of: 1. failure to renew medical staff privileges without good cause, in bad faith, and with malice; 2. failure to provide a fair and impartial hearing in accordance with Joint Commission of Accreditation of Hospitals (JCAH) standards; 3. intentional interference with Silversmith's relationships with his patients and other doctors; 4. conspiracy to deprive Silversmith of medical staff privileges; and 5. deprivation of Silversmith's *540 due process rights relating to his staff privileges in violation of the Florida and Federal constitutions. The jury also found Kaye and Penn guilty of intentional interference, and awarded Silversmith compensatory damages of $1,500,000.00 against all of the defendants, and punitive damages of $350,000.00 against Lake Hospital, $1,000,000.00 against PIA, and $1,500,000.00 against NME.
The trial court reduced the compensatory damage award to $1,160,000.00 finding that to be the maximum amount that the evidence supported, and reduced the punitive damage award to a total of $1,500,000.00 because it felt that the jury's award was excessive, "resulting in a triple assessment." Silversmith accepted the reduction of compensatory damages, but not of punitive damages. On appeal, appellants raise a number of issues, including the lack of a legal or evidentiary basis for the awards to Silversmith. On cross-appeal, Silversmith claims error in the order reducing punitive damages.

FACTS
Silversmith was on the medical staff and was a clinical director at Lake Hospital, a private psychiatric hospital. Silversmith testified that in October of 1982 he and others on the medical staff were concerned and frustrated because the hospital administration was not responsive to their complaints about the operation of the hospital. As a result, he telephoned the State Department of Health and Rehabilitative Services (HRS) to register his complaints. Subsequently, an HRS inspector performed an inspection and wrote a report on the deficiencies. A reporter for a local newspaper learned of the HRS report and interviewed Silversmith who showed him around the hospital. The newspaper then published an article critical of the hospital titled "Lake Hospital Cited for Safety, Other Violations." Immediately thereafter, officials of PIA contacted Silversmith and asked him to meet with Penn, a hospital administrator, and Kaye, a medical director. They informed Silversmith that they were concerned about the adverse impact of the article on the hospital and its staff. When Silversmith refused to resign as clinical director, Kaye and Penn fired him. They also asked Silversmith to write a letter of apology to the hospital administration in regard to the article. They prepared a letter of apology which Silversmith signed.
Previously, in September of 1982, the hospital credentials committee, and in November of 1982, the executive committee, had approved the renewal of Silversmith's medical staff privileges, and the medical staff had accepted the committees' recommendations. However, in November, officers of PIA asked Neil Shapiro, the regional administrator of PIA, to consider terminating Silversmith's staff privileges. At that time, Kaye and Penn also met with the hospital nurses at Lake Hospital, and asked them to document any complaints they might have about Silversmith. In January of 1983, the hospital's board of directors voted to deny Silversmith's renewal of medical staff privileges. The reasons given included Silversmith's involvement with HRS and the press, as well as an allegation that he did not get along well with the nursing staff.
On January 31, 1983, the board informed Silversmith of its decision not to renew his staff privileges and of his right to a hearing on the issue. Silversmith requested a hearing on the board's determination, and a hearing was set for March 2, 1983. Norman Zober, president of PIA, appointed the members of the hearing committee. The committee consisted of Shapiro, Dennis Santoli, the hospital's lawyer, and Dr. Rufus Vaughn, a medical staff member. Silversmith objected to the hearing as unfair because Shapiro and Santoli had previously voted against him as members of the board of directors, and because he had not been given a prior list of the prosecution's witnesses and evidence. Penn acted as the prosecutor before the hearing committee. Kaye and two nurses were witnesses for the prosecution. Penn alleged that Silversmith failed to cooperate with the hospital administration and staff. He also presented a "book" of memoranda collected from the nurses at his request. The hearing committee voted against Silversmith. Dr. *541 Vaughn subsequently testified at trial that the committee decided not to renew Silversmith's privileges because he was unable to work effectively with the nursing staff.
The hearing committee notified Silversmith that it was recommending to the board that his privileges not be renewed, and that he could request appellate review. He requested appellate review, and a hearing was scheduled for May 11, 1983. The appellate committee consisted of the board of directors and Dr. Vaughn. Silversmith argued that the the hearing committee was biased and his hearing had been unfair. The appellate committee voted to confirm the hearing committee's recommendation. Silversmith subsequently filed this action.
At trial, in addition to presenting evidence of the denial of his staff privileges, Silversmith presented the testimony of Dr. Richard Gordon. Dr. Gordon was qualified as an expert on the Joint Commission of Accreditation of Hospitals (JCAH) standards. Dr. Gordon testified that it was improper for the board not to renew Silversmith's privileges without first having a fair hearing. He said that Lake Hospital's bylaws did not meet JCAH standards for a fair hearing because they permit board members who have already denied the renewal of a doctor's staff privileges to sit on the hearing committee, and then to sit again on the appellate committee. He felt that the JCAH surveyor who approved the hospital's bylaws in 1981 must have done only a superficial investigation of them, especially since a JCAH surveyor flunked the same set of bylaws in 1985. Evidence was also presented that the medical staff was not consulted about the board's denial of Silversmith's privileges, and a joint-committee of medical staff and hospital administrators was never formed in regard to the matter. Several nurses testified that they never had any problems working with Silversmith, and some members of the medical staff testified that Silversmith's complaints concerning the nursing staff and administration were justified.

ADMISSION OF RECORDS OF REVIEW PROCEEDINGS
Over the objection of the appellants, the trial court allowed the records of the proceedings of the various hospital committees involved in the decision to terminate Silversmith's staff privileges to be introduced into evidence. It also allowed witnesses to testify as to what was said and done at those meetings. Appellants contend that this constituted a violation of section 768.40(4), Florida Statutes (1981), which states:
The proceedings and records of Committees as described in the preceding subsections shall not be subject to discovery or introduced into evidence in any civil action arising against a provider of health services arising out of the matters which are the subject of evaluation and review by such committee, and no such person who was in attendance at a meeting of such committee shall be permitted or required to testify in any such committee as to any findings, recommendations, evaluations, opinions, or other actions of such committees or any members thereof.
Section 768.40(1), Florida Statutes (1981), defines "committee" as a committee of "medical staff" which is "formed to evaluate and improve the quality of health service rendered... ."
In Holly v. Auld, 450 So.2d 217 (Fla. 1984), the supreme court held that hospital committees considering matters regarding staff privileges come within the scope of the statute. This court had held to the same effect in Auld v. Holly, 418 So.2d 1020, 1023 (Fla. 4th DCA 1982):
At the outset, we must decide whether a hospital's credentials committee is a "medical review committee" as defined by the statute. A credentials committee is a medical review committee so long as the purpose of the committee is one of those listed in the statute. It is apparent that at least one of the purposes of the credentials committee in the present case is to improve the quality of health care at the hospital by limiting staff privileges to doctors of a certain caliber of competence. Therefore, we conclude that the credentials committee is a medical review committee.
At Lake Hospital, the credentials and executive committees are made up entirely of *542 medical staff members, while the board of directors is made up of hospital administrators and physicians. The hearing committee consisted of at least one medical staff person, Dr. Vaughn, while the appellate committee consisted of at least two medical staff persons, Dr. Vaughn and Dr. Kaye. Thus, at least four of the five above mentioned committees fall within a literal interpretation of section 768.40(1). Arguably, all five should be within the confines of section 768.40(4) since the supreme court in Holly v. Auld held that the policy behind the statute, to encourage confidential peer review, was clear and should be stringently enforced.
All of the hospital committees here appear to be concerned with "limiting staff privileges to doctors of a certain level of competence." Id. at 1023. While some of these committees are not entirely made up of medical staff, it would make no sense to exclude them from the intent of the statute, since the proceedings of those committees would necessarily involve a review of the "medical staff" actions as well as constitute an essential part of the overall peer review process. To permit disclosure of some of these committees' proceedings would constitute, in essence, an end run around the legislative ban on disclosure of other medical staff committee proceedings. See also Feldman v. Glucroft, 522 So.2d 798 (Fla. 1988).[1]
Accordingly, under Holly, it appears that the trial court erred in allowing evidence of the hospital committees' proceedings to be introduced and a new trial must be held for this reason alone. Whether appellee-doctor will be able to prove his claims arising out of the various committees' proceedings without having access to those proceedings remains to be determined.

LIABILITY FOR TERMINATION OF STAFF PRIVILEGES
Regardless of the admissibility of the hospital committee proceedings, the appellants claim that they are not liable for terminating appellee's staff privileges because they acted in good faith and without malice. Section 395.065, Florida Statutes (1981), provides protection to physicians with regard to their staff privileges at both private and public hospitals by setting out standards that hospitals must follow in determining staff privileges. Carida v. Holy Cross Hospital, Inc., 427 So.2d 803 (Fla. 4th DCA 1983). Section 395.065(2) provides that there shall be no liability on the part of a hospital's governing body for any action taken in regard to medical staff privileges "in good faith and without malice." The appellants assert that the evidence shows without dispute that they acted in good faith and without malice in denying the renewal of Silversmith's privileges, and therefore they are immune from liability as a matter of law pursuant to section 395.065(2).
In Lawler v. Eugene Wuesthoff Memorial Hosp., 497 So.2d 1261, 1264 (Fla. 5th DCA 1986), the court defined "good faith" as in conformity with hospital bylaws and the standards set out in section 395.065(1). Those standards limit a hospital's ability to revoke a doctor's staff privileges to good cause, which may include a showing of incompetence, negligence, habitual use of intoxicants, liability for medical malpractice, or mental or physical impairment, and presumably any other "good cause" so long as it is advanced in "good faith and without malice." Section 395.065(1) also requires that hospital procedures concerning staff privileges comply with the standards of the national Joint Commission on Accreditation of Hospitals.
In the instant case, the "good cause" alleged by the hospital did not refer to the statutory grounds set out above, but rather consisted of assertions that Silversmith prompted the newspaper article concerning the hospital's deficiencies, that he was responsible *543 for complaints to HRS about those deficiencies, that he did not get along with the nursing staff, and that his conduct adversely affected the operation of the hospital.
Silversmith presented evidence indicating that his termination was not based on his competency as a physician or on the quality of his patient care, that he did not violate any hospital bylaw or rule, and that he did not act improperly in contacting the newspaper or HRS. He also presented testimony that many persons on the nursing and medical staffs felt that he worked well with the nurses and that his complaints about the hospital were valid. Moreover, Silversmith introduced evidence that indicated that certain members of the hospital board had the nurses document any complaints they might have about him after they had already decided to terminate his privileges. Other evidence indicated that the hospital's staff termination procedures did not comply with the hospital's bylaws, JCAH standards, or Florida Statutes, and were otherwise applied in an unreasonable manner. See Sarasota County Public Hospital Bd. v. Shahawy, 408 So.2d 644 (Fla. 2d DCA 1982).[2] In essence, Silversmith claimed that he was terminated because he refused to ignore serious deficiencies in the hospital's operation, and because he eventually made those deficiencies publicly known in order to have them remedied. His contention at trial, in support of which he presented substantial evidence, was that the hospital officials fabricated other complaints against him in order to have a basis to terminate his privileges.
Taken together, we believe the evidence created an issue of fact of whether the defendants violated the provisions of section 395.065(1) and acted "in good faith and without malice," and we find no error by the trial court in submitting the issue of appellant's liability to the jury.

DUE PROCESS
The appellants also argue that it was improper for the trial court to submit a constitutional due process claim to the jury because private hospitals, unlike public institutions, are not required to comply with due process standards.[3]
The law in Florida is not entirely clear on this issue. The debate over a physician's hospital staff rights in Florida began with a struggle over whether public hospitals were required to comply with due process requirements. In 1946, the supreme court ruled in Bryant v. City of Lakeland, 158 Fla. 151, 28 So.2d 106 (1946) that hospital administrative action concerning the suspension of medical staff standards did not have to meet due process standards because physicians did not have a per se right to practice in a hospital. By 1962, however, the court's stance changed, and in North Broward Hosp. v. Mizell, 148 So.2d 1 *544 (Fla. 1962) it held that hospital administrators are bound by the principles applicable to other public officers, i.e., reasonable and judicially reviewable discretion that comports with constitutional concepts of due process.
Subsequently, the court distinguished between the conduct required of public hospitals from that required of private hospitals. In West Coast Hospital Ass'n v. Hoare, 64 So.2d 293 (Fla. 1953), the supreme court stated that private hospitals' managing authorities are not subject to the same standards as public officials in regard to the granting of medical staff privileges. The court held that the management and operation of a private hospital are governed by rules which apply in the case of a private corporation generally, unless modified by statute. See also Burris v. Morton F. Plant Hosp., 204 So.2d 521 (Fla. 2d DCA 1967). Courts made determinations of whether a hospital was public or private by considering the amount of government involvement in a hospital's management. If the amount of involvement did not rise to the level of "state action," then due process guarantees were found not to be applicable. See Moles v. White, 336 So.2d 427 (Fla. 2d DCA 1976), cert. dism., 355 So.2d 516 (Fla. 1978); Monyek v. Parkway General Hosp., Inc., 273 So.2d 430 (Fla. 3d DCA 1973).
One court, however, held that a physician could claim a violation of due process against a private hospital upon the termination of his staff privileges if such privileges were explicitly protected by the hospital's own bylaws. Margolin v. Morton F. Plant Hosp. Assoc., Inc., 348 So.2d 57 (Fla. 2d DCA 1986). Margolin did not elaborate on the content of the hospital's bylaws but cited to three cases in other jurisdictions. The first case cited, McElhinney v. William Booth Memorial Hosp., 544 S.W.2d 216 (Ky. 1977), referred only to the general proposition that a hospital must act in accordance with its charter and bylaws in revoking staff privileges. The other two cases cited held that staff members are entitled to hearings before termination when private hospitals have charters or bylaws which provide for them. See Joseph v. Passaic Hospital Assoc., 26 N.J. 557, 141 A.2d 18 (1958); Berberian v. Lancaster Osteopathic Hospital Association, Inc., 395 Pa. 257, 149 A.2d 456 (1959).
Although section 395.065 (now section 395.0115) was enacted in 1975, it wasn't until 1983 that appellate courts began to consider its effects. This court in Carida v. Holy Cross Hosp., Inc., 427 So.2d 803 (Fla. 4th DCA 1983) noted that section 395.065 eliminated the distinction between public and private hospitals for purposes of protecting staff privileges. Later, in Lawler v. Eugene Wuesthoff Memorial Hosp., 497 So.2d 1261 (Fla. 5th DCA 1986), the court stated that one of the purposes behind section 395.065 was to require both private and public hospitals to handle staff privileges in conformity with fairness and due process. The comments in Carida and Lawler are justified in light of Hoare, in which the supreme court said that private hospitals are governed by the rules of private corporations "unless modified by statute."
By the enactment of section 395.065(2), it appears that the legislature recognized the importance of staff privileges in private as well as public hospitals, to a physician's ability to practice medicine, even though Florida's courts had recognized no protected rights under the Florida and Federal Constitutions. However, in accordance with Hoare, it is only because of the enactment of section 395.065 that private hospitals have been held accountable for the manner in which they regulate staff privileges. Based on the analysis set out above we conclude that, while appellee has a statutory claim under section 395.065, he has no constitutional due process claim.

INTENTIONAL INTERFERENCE
The appellants moved for a directed verdict at the close of all the evidence on the claim of intentional interference. The appellants correctly note that Lawler is specifically on point with the instant case. In Lawler, 497 So.2d at 1263, the court held that to support a claim of tortious interference with business relationships in *545 a case like the instant one, there must be a showing that the defendants actually interfered with a particular doctor/doctor or doctor/patient relationship. It is not sufficient to show that there was an interference with such relationships as an indirect consequence of the termination of the plaintiff's staff privileges. Id. We agree.
While Silversmith presented a case sufficient to suggest that the appellants acted improperly in the termination of his privileges and he may be entitled to any damages caused thereby, he did not present a case sufficient to suggest that appellants specifically interfered with particular relationships with his patients and other physicians. Accordingly, we agree that the trial court erred in not granting the appellants' motions for directed verdict on the tortious interference claim.[4]

CONSPIRACY
The appellants claim that they could not have conspired to deprive Silversmith of his privileges because they were all acting on behalf of Lake Hospital in their official capacities. In Buckner v. Lower Florida Keys Hospital Dist., 403 So.2d 1025 (Fla. 3d DCA 1981), rev. denied, 412 So.2d 463 (Fla. 1982), the court stated that a decision regarding staff privileges was necessarily made through hospital officials acting as a single entity. It held that a cause of action for conspiracy could not be made against those officials because none of the officials individually could make the decision to grant or deny staff privileges. Id. at 1028. Such a decision can be made only through a composite of the defendants acting in their various official capacities. Id. See also Lawler, 497 So.2d at 1263.
In the instant case, there was not any evidence that the named defendants acted on personal motivation or played an active role in the termination of Silversmith's privileges outside of their activities in the administration of the hospital. Accordingly, in accord with Buckner, we agree that the trial court erred in submitting the conspiracy issue to the jury for determination.

EXCLUSION OF EXPERT TESTIMONY
The appellants argue that the court erred in finding that their experts, Fredrick Raine and Dr. Walter Feldman, were not qualified to testify as to JCAH standards. A trial court's decision on the qualifications of an expert is ordinarily conclusive, and entitled to great weight on appeal, unless it is shown that the trial court applied erroneous legal principles in arriving at its decision. Upchurch v. Barnes, 197 So.2d 26 (Fla. 4th DCA 1967). To qualify as an expert in a given area, it must be shown that the witness has acquired special knowledge of the subject matter either by study or through experience. Id.
In the instant case, although neither Mr. Raine nor Dr. Feldman worked as a JCAH surveyor, or was certified as an examiner for the JCAH, both were experienced in hospital administration and claimed to have special training or experience with JCAH standards. This, in our view, established a prima facie case of their expertise. We reject appellee's position that only persons directly associated with JCAH are qualified to express opinions on the JCAH standards. Accordingly, we believe the trial court erred in excluding their testimony.

PREJUDICIAL COMMENTS
The appellants argue that certain comments made by counsel constitute reversible *546 error. The trial court gave the jury a curative instruction asking that it ignore the comments because they had no significance to the case. In our view the curative instruction sufficiently remedied any error. See Oceancrest Condo. Apts., Inc. v. Donner, 504 So.2d 447 (Fla. 4th DCA 1987).

EVIDENCE OF DAMAGES
Appellants claim appellee presented insufficient evidence of his loss of earnings to justify the jury's award. Mr. Irving Goffman, an economist, testified as to Silversmith's loss of earnings "from the hospital." In Lawler, 497 So.2d at 1264, the court noted:
It cannot be seriously questioned that the loss of staff privileges for a doctor at a hospital is a serious disadvantage to his or her ability to continue to practice in the community  particularly in this case where there are no other nearby hospitals. The loss of staff privileges equates to a loss of patients and the ability to practice in this doctor's specialty  radiology.
Like in Lawler, Silversmith presented facts to the jury that suggested that the termination of his privileges limited his ability to practice his specialty in the area. Whereas in Lawler the court noted that it may be difficult to prove the amount of future lost earnings, in the instant case, Silversmith provided the jury with a calculation. Therefore, we believe the compensatory damage award was supported by the evidence.
For the reasons enunciated above, we reverse the trial court's final judgment and remand for further proceedings consistent herewith. Because we are reversing for a new trial on all issues, we decline to rule on the issue of whether the trial court erred in reducing the punitive damage award.
GUNTHER, J., concurs.
WARNER, J., concurs in part and dissents in part with opinion.
WARNER, Judge, concurring in part and dissenting in part.
I concur in the opinion except with respect to the issue regarding the exclusion of the appellant's experts. The trial court found that they did not possess the qualifications to testify as experts on Joint Commission of Accreditation of Hospitals standards on the basis of education, training or experience. Given the evidence concerning their qualifications, I cannot find that the trial court abused its discretion or applied erroneous legal principles, particularly with respect to Dr. Feldman.
NOTES
[1] In Feldman v. Glucroft, the Florida Supreme Court rejected the Third District's holding that the provisions of section 768.40(1) and (4) effectively barred a defamation action growing out of peer review proceedings. The court noted that these sections just make it more difficult to prove such a claim. These observations would appear to also apply to wrongful termination cases.
[2] Article III, Section VII(a) of Lake Hospital's bylaws entitled "Final Decision by Governing Body" requires that if the board of directors decides to terminate a doctor's staff privileges in contradiction to the executive committee's recommendation, it must refer the matter to a Medical Staff-Board of Directors joint committee for further review and recommendation. Silversmith claimed that the board violated that bylaw in denying the renewal of his staff privileges. Testimony was presented that the board of directors never consulted the medical staff in regard to the matter and that a joint committee was never formed for further review prior to the hearings. Accordingly, it would appear that Silversmith presented sufficient evidence to support his claim based on a violation of the hospital's bylaws.
[3] The appellants also argue that the trial court erred in submitting the due process claim to the jury for determination, when it knew that it was going to find Section 395.065 (1981) (Section 395.0115 (1985)) unconstitutional based on a due process analysis. However, the trial court did not base its ruling that Section 395.065 is unconstitutional on a due process analysis. Instead, it found that the statute represents an unlawful delegation of authority to the JCAH because it does not provide JCAH with standards to consider in determining what constitutes a fair hearing in regard to a denial of staff privileges. The constitutionality of Section 395.065 was a collateral issue because the due process claim submitted to the jury was not based on an alleged violation of that statute but was based on an alleged violation of the state and federal constitutions. The appellants do not contest the validity of the trial court's ruling. They only claim that its timing unnecessarily prejudiced the jury's determination. We fail to see how the trial court's ruling, made after the jury's verdict, affected the verdict.
[4] It is also contended that it was error to allow the jury to determine whether Kaye and Penn interfered with Silversmith's contract with the hospital because they are employees of the hospital. Silversmith counters that although Kaye and Penn work, and are on the Board of Directors, at Lake Hospital, they are employees of PIA. The evidence shows that while Kaye and Penn are both employees of PIA, they are also on the medical staff and hospital administration, respectively, at Lake Hospital. Since they do not work in Washington D.C. at PIA headquarters, or in South Florida as regional administrators for PIA, it would seem that they are employed by PIA on behalf of its subsidiary, Lake Hospital. Thus, they act as agents for Lake Hospital. The trial court erred in submitting the contract inteference claim against them to the jury. West v. Troelstrup, 367 So.2d 253 (Fla. 1st DCA 1979).