GLICKSTEIN, Judge.
This is an appeal by plaintiff of a circuit court order granting defendants a new trial after the jury found for plaintiff, and for alternative relief absent reversal of that order. We affirm the first order but also grant alternative relief, in part, upon remand.
Plaintiff/appellant Oceancrest Condominium Apartments, Inc. (the association) alleged that defendants William Donner, Roseanne Vaughn, Harry Kanter and Amy Steele, the original officers and directors of the association, had violated the condominium statute and otherwise breached their fiduciary duties to plaintiff by failing to collect assessments on condominium units owned by the developer. Donner, Vaughn and Steele answered, denying the allegations and stating three affirmative defenses: (1) plaintiffs as individuals had previously agreed the maintenance fees were not due because plaintiffs themselves delayed the closings on the units involved; (2) defendants paid the equivalent or more in kind, and (3) Amy Steele was not an officer or director at times pertinent, and therefore should not be a defendant. The four defendants filed a further affirmative defense that in an attached contract (which we do not find attached) plaintiffs agreed to indemnify and hold harmless the defendants, and that they need not pay the assessments until after four months from the first closing. The defendants also filed a counterclaim for indemnity and breach of contract.
The association filed a motion to strike two of the defendants’ affirmative defenses, contending that the first defense referred to something some non-party individuals allegedly agreed to, and that the second refers to a defense not cognizable under Chapter 718, absent an agreement between the association and the defendants for operating, maintaining or managing the condominium. The motion was subsequently denied without prejudice to reargument at trial. The first affirmative defense was stricken at the close of the plaintiff’s case. In a second amended answer, the defendants raised an additional affirmative defense — immunity pursuant to section 718.116(8)(a) and (b), Florida Statutes (1983), and later added a setoff for unjust enrichment, as a counterclaim. The added count refers to Exhibit A of the complaint, the same contract, apparently, as previously referred to, and to sums expended under that contract that were allegedly specified in discovery as to defendants’ second affirmative defense.
The case went to trial before a jury. Early in the trial, there was a motion for mistrial because an attorney for plaintiff asked Ms. Steele whether it was not true her husband (Mr. Donner) and she were making substantial profits from other developments all over South Florida. After much discussion outside the hearing of the jury the court decided to defer acting on the motion until the close of plaintiff’s case.
At the conclusion of the association’s case, the defendants moved for directed verdict as to all counts of the association’s complaint. The trial court granted the motion for directed verdict as to count II of the plaintiff’s complaint, which alleged breach of fiduciary duty. The court denied the directed verdict motion as to count I, and reserved ruling on the motion for mistrial. An effect of the grant of directed verdict as to count II was to dismiss Ms. Steele as a party, as count I was not directed at her.
Subsequently defense counsel again moved for mistrial, because of a question put to defendant Donner. The question *449 indicated that Donner had suggested to his lawyer that he change the answer to a question because the answer previously given was damaging to his defense. The court reserved ruling on this motion pending a jury verdict.
At the close of the association’s case, it reopened the issue of the legal sufficiency of defendants’ affirmative defenses. The motions to strike the remaining affirmative defenses were denied.
The court instructed the jury on the affirmative defense of setoff, and immunity under the condominium statute. The jury found Kanter, Donner and Ms. Vaughn had violated the condominium act, but assessed $131,767 in damages against Kanter and Donner only. The court entered no judgment.
Donner and Kanter moved for a new trial, and the motion was granted. The association promptly appealed.
Oceancrest Condominium Apartments, Inc. is the not-for-profit corporation that is the condominium association of the Ocean-crest condominium. Kanter Enterprises, Inc., owned by Harry Kanter, owned the land on which Oceancrest was built, and was the condominium’s developer. Donner Enterprises, Inc., owned by William Donner, was apparently co-developer, and the general contractor that managed the construction project. Roseanne Vaughn was an employee of Donner Enterprises. Amy Steele, who was an officer of the association during times pertinent, is Mrs. Donner. Harry Kanter, William Donner and Rose-anne Vaughn were officers and directors of the association from 1981 through August 1983, at which time the unit owners took over the association. These defendants had been appointed directors of the association by the developer.
Certificate of occupancy for the condominium was issued in June 1982. The sale of the first unit was closed upon within a few days. During the time up to the unit owners’ takeover of control of the association, the developer continued to hold title to a number of units. There was testimony the project had financial difficulties. The record indicates maintenance fees were assessed on all units including those still owned by the developer. The developer did not, however pay the assessments. According to testimony for the defense, the developer thought it wiser to spend the limited amount of money available on decorating the common elements, daily operations and the like. There were not enough funds to meet necessary expenditures and pay the maintenance fees on the developer-owned units. Ms. Vaughn testified that the association and its officers and directors did not file liens against the developer-owned units for the unpaid assessments. Article VI, section 4(d)(2) of the condominium bylaws [and section 718.-301(3), Florida Statutes (1981) ] prohibit the board of directors of the association from taking any action that would be detrimental to the developer’s sale of condominium units without written approval of the developer. Ms. Vaughn testified she accepted Mr. Donner’s assurance that the developer was spending more on management, furnishings and improvements than it was required to, and that those expenditures would more than cover the unpaid assessments. She knew the assessments on developer-owned units were not being paid.
Patricia Gordon, plaintiff’s expert witness, is a certified public accountant. Ms. Gordon calculated that unpaid maintenance fees owed by the developer, prior to the takeover of the association by the unit owners, plus a deficit in the accounts for the first four months after the first closing, plus interest on both the deficit and the delinquent maintenance fees, totalled $142,-000. The interest was calculated at eighteen percent as provided in the declaration of condominium. Only about half of the money that should have been in the statutorily required reserve accounts, and also called for in the association budget, was there, obviously because the assessments had not been paid on the developer-owned units.
The issues, restated, are as follows:
I. Whether the trial court erred in granting appellees/defendants’ motion for a new trial. We conclude it did not.
*450 II. Whether the trial court erred in directing a verdict on the second count of appellant/plaintiffs complaint. We conclude it did, but was correct in eliminating the question of punitive damages.
III. Whether the trial court erred in not striking the defendants’ affirmative defenses of “in-kind services” and “guaranteed maintenance.” We conclude it erred as to the latter.
I
This expensive retrial has been occasioned by two factors. The first is discussed in Ford Motor Company v. Kikis, 401 So.2d 1341, 1342 (Fla.1981), which held:
We have stated and restated the appropriate standard for district courts on review of a trial court’s motion granting a new trial. The test is whether the trial court abused its ‘broad discretion.” If reasonable men could differ as to the propriety of the action taken by the trial court, then there is no abuse of discretion.
(Citations omitted.) Virtually the same text appeared earlier in another context, in Canakaris v. Canakaris, 382 So.2d 1197 (Fla.1980), which quoted a portion of a paragraph in Delno v. Market Street Railway Company, 124 F.2d 965, 967 (9th Cir.1942). Judge Haney’s entire thought on the subject in that opinion was the following:
The word “discretion” is not a happy choice in this connection, because of the different senses in which it can be used. “Discretion” in one sense is explained as follows: “The discretion of a judge is said by Lord Camden to be the law of tyrants: it is always unknown, it is different in different men; it is casual, and depends upon constitution, temper and passion. In the best, it is oftentimes caprice; in the worst, it is every vice, folly, and passion to which human nature is liable * * * ”. 1 Bouv. Law Diet., Rawles’ Third Revision, p. 885. Whether any judicial action is discretionary in that sense, it is unnecessary to determine. If it is, the action is final and cannot be upset on appeal.
In a second sense, and the one most commonly meant in the use of the word in the law, “discretion” is defined as: “The power exercised by courts to determine questions to which no" strict rule of law is applicable but which, from their nature, and the circumstances of the case, are controlled by the personal judgment of the court.” 1 Bouv. Law Diet., Rawles’ Third Revision, p. 884. Judicial action — discretionary in that sense — is said to be final and cannot be set aside on appeal except when there is an abuse of discretion. A common example is a court’s ruling on the extent of cross-examination. Alford v. United States, 282 U.S. 687, 694, 51 S.Ct. 218 [220], 75 L.Ed. 624. Discretion, in this sense, is abused when the judicial action is arbitrary, fanciful or unreasonable, which is another way of saying that discretion is abused only where no reasonable man would take the view adopted by the trial court. If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion.
The second factor occasioning the need to retry this case is what actually occurred at trial, the parties both recognizing that there were only two episodes which occurred, not three as the trial court recited in its order, saying:
During the examination of Amy Steele Donner, the plaintiff on direct examination attempted to interject the question of the worth of the defendants into this proceeding and the defendants objected and moved for a mistrial, docket entry #137.
Subsequently upon cross examination of defendant William Donner, the defendant again on cross examination attempted to elicit from Mr. Donner the financial success in other condominium developments in south Florida on behalf of the defendant. Both instances in violation of the Court’s Motion in Limine.
Third, upon recess and returning from a lunch break, the defendant, William Donner, was on the stand, and during cross examination the plaintiff attempted *451 to elicit an answer from the defendant, William Donner, in response to his question which raised the spector [sic] before the jury that defendant William Donner had conferred with his attorney and had been instructed to change his testimony. Again a Motion for Mistrial was made by the defendant and the Court reserves [sic] ruling on the Motion for Mistrial.
The alleged second episode never occurred. Moreover, the trial court erred, to some extent, in its description of the “third” episode in its reference to Mr. Donner having been instructed to change his testimony. In fact the fatal egregious question which the association’s counsel asked on cross-examination came at the end of the following line of questions:
Q. Mr. Donner, one of the first things your lawyer asked you is did you recall making the statement yesterday to the effect that you didn’t care if the Association loses any money.
Do you remember that?
A. I didn’t state that. I didn’t say that.
Q. Let me, if I might, I will read to you the exact words you said and ask you if you recall that.
The question: “Do you recall her asking” — I am referring to Pat Gordon, the question: “Do you recall her asking for financial information, being concerned about the status of the Association.
“Answer: I recall her asking for financial information. I don’t recall her being concerned. See, you keep characterizing it as ‘concerned’. I don’t think it was ‘concerned’.
“Question: Were you concerned?
“Answer: No, I was not concerned.
“Question: Were you concerned for your corporation losing money in this project?
“Answer: The project had already lost money.
“Question: Were you concerned about losing more money?
“Answer: I think we are always concerned, a developer would always be concerned or anybody who is in business is concerned about losing money, yes.
“Question: Were you concerned about the Condominium Association losing money?
“Answer: No, I was not.
“Question: Pardon me?
“Answer: No, I was not.”
Those being your words, do you recall those words?
A. Yes I do.
Q. And after we recessed yesterday you talked to your lawyer about that statement, didn’t you?
A. I don’t know that I talked to my lawyer about the statement. I don’t remember talking to him about it, no.
Q. Isn’t it true that over the break last night you talked to him or he talked to you and you said ‘we better change that because that is extremely damaging to our case’?
(Emphasis added.)
Applying the test of Ford v. Kikis to the foregoing episode, it is our view that reasonable persons, trained in the law could differ upon the propriety of the trial judge’s decision. The Association contends the question was appropriate; that it was not Mr. Donner’s attorney whose motion for mistrial commenced the inquiry; that no objection was made to the question— when asked — based on the attorney-client privilege; and that no prejudice occurred because the question did not involve Mr. Kanter, but the jury found against him also. However, we conclude it was reasonable for the trial court to believe the jury was prejudiced for the reason expressed by Judge Stone in his concurrence. Unlike St. Azile v. King Motor Center, Inc., 407 So.2d 1096 (Fla. 4th DCA 1982), in which we reversed the failure of the trial judge to declare a mistrial after defendant’s counsel accused one of plaintiff’s witnesses of lying on the stand, demanded a warning as to perjury and requested the state attorney be brought in, here the trial judge, on reflection, felt prejudice had occurred, and did something about it. Judge Stone’s concurrence points out the role of the trial judge *452 in evaluating whether the improper question influenced the jury’s verdict. The trial judge, while presiding, assumedly can perceive jurors’ responses to a question by observing them when it is asked. What impact it actually has depends upon a number of factors, including among others (1) the attention being given by each juror at the particular time, and (2) the understanding by each juror of the question’s significance. We said in St. Azile.
It is inconceivable to us that the jury in this case was not prejudiced by counsel’s remarks.
Id. at 1098.
Although the foregoing could be true, perhaps we should have said:
It is unreasonable to believe the jury was not prejudiced by counsel’s remarks.
We have placed the two episodes here in an order that accords with our perception of their egregiousness. The less inflammatory episode occurred, too, on cross-examination, when the individual defendant, in whose favor the trial court later directed a verdict, was being asked about a $2,000,000 note she had individually guaranteed with respect to the development of the 'subject condominium project. This colloquy then occurred, following which a motion for mistrial was made:
Q You signed in your individual capacity as Amy Steele, a person, correct?
A I think I can explain that to you if you would let me.
Q First, answer yes or no. Did you?
A No, I didn’t.
Now I have to explain why it looks like I did. I am, I am a working woman and I felt that I was not, and whenever I prepared a deed for someone I didn’t say Leon StJohn and Mary St. John, his wife, because I don’t believe that that is correct, and so every bank I have to sign my name on behalf of my husband as his wife.
I wanted to sign my own name without having the term “his wife,” and the banks allowed me to do that, but I didn’t sign that because I wanted to. I did not want to be responsible for that loan, especially because the project was terrible. But I didn’t have a choice because they couldn’t complete the building and they wouldn’t have finished the units if the bank didn’t extend the mortgage, and that is all it was. It was an extension of the mortgage for a terrible, a terrible project that cost us everything.
Q It cost you everything?
A Everything that my husband put into that project, everything. It hurt me terribly that everything he put in he lost.
Q In that project?
A Yes sir.
Q Isn’t it true that your husband is, as well as yourself, are making substantial profits from other developments all over South Florida?
All of the parties’ counsel then suggested to the trial court that it reserve ruling on the motion for mistrial until the close of the plaintiff’s case, at which time the trial court could then rule upon the defendant’s motion for directed verdict. The trial court agreed.
The apparent basis for the inclusion by the trial court of this episode in its order is its pre-trial order, directing the plaintiff not to bring the defendants’ net worth into the trial. While plaintiff's counsel had already introduced evidence of a number of other projects in which the' defendants were involved — which introduction is not an issue — his last question could reasonably be construed as an abuse of the trial court’s order.
Recently the writer read that Federal District Court Judge James C. Paine, who was presiding over a long and expensive trial, was planning to interview the jurors, to determine whether an episode at trial had had a prejudicial, effect. It may be well for the state courts to consider whether there are circumstances in which they might employ Judge Paine’s technique. Taxpayers have the right to believe that the judicial system — state and federal — is going to be as prudent as possible with tax dollars. Every dime wasted because of an unnecessary mistrial or new trial deprives this state and nation of a dollar in desperately needed social or other services.
*453 II
We find the trial court did err in directing the verdict in favor of all of the defendants on plaintiffs second count, based upon the same state of facts as the count upon which the plaintiff prevailed. The essence of the tort count is that the failure of the defendant directors to collect the assessments was willful and wanton; and that the actions would increase the benefits to themselves at the expense of the association.
There are two pertinent cases which were not cited by any of the parties but which the writer’s office has located. The first is B & J Holding Corporation v. Weiss, 353 So.2d 141 (Fla. 3d DCA 1977), wherein the appellate court found that similar allegations, together with others, did not constitute a willful, independent tort which was separate from an action for breach of contract which would support punitive damages. The court, however, also said:
Next, defendants Sternberg, Okun and Halpern contend the court erred in instructing the jury that it could find them personally liable, as initial officers and directors of the condominium association, for B & J’s failure to make the maintenance payments for the unsold units to the association.
In support of their contention, defendants cite to 7 FlaJur. Contracts § 305 (1956):
“§ 305. Liability for Corporate Acts, Debts, and Contracts.
“The directors or officers of a corporation are not liable for corporate acts and debts simply by reason of their official relation to the corporation; they are merely the agents of the corporation and on principle should no more be held liable therefore than any other agent should be held for the acts and debts of his principal ...”
Although we do not take issue with the above principle of law, we nevertheless find it inapplicable here as the defendants are not being held liable in their capacity as principal officers of B & J, but rather as the condominium association’s initial directors and officers who deliberately failed to collect the maintenance payments due the association from B & J as owner of the unsold units. We hold that where an officer and director of a corporation occupies a quasi-fiduciary relationship toward the corporation and its stockholders and is bound to act with fidelity and the utmost faith, he (or she) in accepting the office impliedly agrees and undertakes to give the corporation the benefit of his (or her) best care and judgment and to exercise his (or her) powers in the interest of the corporation and the stockholders; officers and directors are liable for damages to the corporation which results from a breach of their trust on the common law rule of the responsibility of an agent for injury to his principal. See Flight Equipment & Engineering Corp. v. Shelton, 103 So.2d 615 (Fla.1958) and 7 Fla.Jur. Corporations §§ 229-300 (1956) and cases cited therein. Thus, we conclude the personal liability instruction was correct and the evidence was sufficient to support the verdict holding defendants personally liable.
Id. at 143 (footnote omitted). See also Olympian West Condominium Association, Inc. v. Kramer, 427 So.2d 1039 (Fla. 3d DCA 1983), which discussed B & J Holding Corp. as a case “in which the directors failed to comply with the duty to collect assessments imposed by the condominium law, Section 718.111(6), Florida Statutes (1981)....” Mat 1039.
We find no legitimate basis for the plaintiff to separate its complaint into two counts, and to call Count I “Ch. 718, F.S.” and Count II “Tort.” The essence of Count I is to list the provisions of Chapter 718, Florida Statutes (1983) which the board of directors purportedly violated, and to seek relief against them. Count II dresses up the same allegations in the garb of fiduciary duty and lays it at the feet of the board and of the officers, adding the claim for punitive damages, which claim the trial court appropriately removed from the jury’s consideration.
*454 Our view, albeit hindsight, is that the trial court should consider all of the complaint as one count, alleging the breach of a duty imposed by board membership and corporate office. Had it previously done so, it would have not directed a verdict in favor of any of the defendants. That Amy Steele was “only” an officer, not a member of the board, does not absolve her from her duty. B & J Holding Corp. makes that clear, unless it could be determined as a matter of law that Ms. Steele had not been an officer of the association at times pertinent.
The verdict in this case is anomalous. One of the directors, Roseanne Vaughn, was found by the jury to have breached her duty as a director but not liable for any damages. Perhaps that supports the trial court’s ordering of a new trial, if it suggests the jury wished to nail Mr. Donner to the wall. It does not, however, explain why Mr. Kanter was tarred with the brush used on Mr. Donner, although the same lawyer represented both.
Ill
There is one additional error, in our opinion; namely the failure to strike one of the affirmative defenses raised by the defendants that of “guaranteed maintenance.” Section 718.116(8)(b), Florida Statutes (1983), permits excusing a developer from paying his share of common expenses if he guaranteed, in specified writings, to each purchaser, that maintenance fees would not rise above a specified amount, but rises would be underwritten by the developer, for a specified period of time.
Appellee claims the Declaration of Condominium provided a basis for such an excuse of the developer. Page four of the condominium declaration tracks the statutory language, saying if the developer makes the appropriate guarantee he will be excused from paying his share of the common expenses. The declaration does not say the developer made such a guarantee. The appellants call attention to the contract of sale which was in fact used in selling the units. This contract contains language stating that the seller will share in the common expenses as provided in the declaration, and will be excused for four months following the first unit sale/purchase. The contract goes on to say the purchaser understands the amount of the monthly common expenses is an estimate and is not guaranteed. As appellants point out, section 718.116(8)(a), Florida Statutes (1983), permits a four months’ grace period. The contract must be referring to that, as there is clearly no guaranteed limit on maintenance fees. On remand for new trial, this defense should therefore not be allowed. On the other hand, no claim should be allowed for developer payment of maintenance fees for the grace period.
DELL, J., concurs in conclusion only.
STONE, J., concurs specially with opinion.